## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-00461-SBP

RYAN HORACE,

      Plaintiff,

v.

CINCINNATI INSURANCE COMPANY,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

**Susan Prose, United States Magistrate Judge**

The matter is before the court on Plaintiff Ryan Horace's Motion for Summary Judgment, ECF No. 40 ("Mr. Horace's Motion"), and Defendant Cincinnati Insurance Company's Motion for Summary Judgment, ECF No. 41 ("Cincinnati's Motion"). The undersigned United States Magistrate Judge presides over this case pursuant to 28 U.S.C. § 636(c), the parties' consent (ECF No. 12), and the Order of Reference dated April 8, 2024 (ECF No. 23). The court has jurisdiction under 28 U.S.C. § 1332.[1]

---

[1] Mr. Horace's claim against Cincinatti, an Ohio corporation, for damages for alleged statutory bad faith under Colorado Revised Statute § 10-3-1116, along with his claim for attorney's fees, places the amount in controversy here in excess of $75,000. *See* ECF No. 3 ¶ 57 ("Pursuant to C.R.S. § 10-3-1116, for this claim Plaintiff is seeking his reasonable attorney fees, court costs, and two times the Agreed Value covered benefit of $35,024.00 (plus title fees, sales tax, and any other transfer or registration fee associated with the total loss of a motor vehicle, totaling at least $38,036.06) and two times the covered benefit of $15,000.00 for Transportation Expenses."); ECF No. 1 ¶ 6 (identifying Cincinnati as an Ohio corporation with its principal place of business in Ohio); *see also, e.g.*, *Washington v. Am. Fam. Mut. Ins. Co.*, No. 12-cv-02229-REB-KLM, 2013 WL 1412327, at *4 (D. Colo. Mar. 18, 2013) (finding that a claim for statutory damages

The court has carefully considered the briefing on the Motions, the applicable law, the record before the court, and the parties' respective positions presented at oral argument. ECF No. 56. For the following reasons, Cincinnati's Motion is respectfully **GRANTED**, and Mr. Horace's Motion is respectfully **DENIED**.

## BACKGROUND

On January 1, 2024, Mr. Horace was in an accident that resulted in the total loss of his 2016 Ford F-150 pickup truck (the "Truck"). At the time, Mr. Horace had a policy with Cincinnati that contained a "Capstone" endorsement requiring that Cincinnati pay him the higher of an "agreed value" or the "actual cash value" in the event of a total loss of the Truck. On January 10, 2024, Cincinnati offered to pay Mr. Horace $39,773.09—an amount greater than the Truck's agreed value of $35,024 under the Policy—but he disputed Cincinnati's calculation and refused to provide the title to the Truck, a prerequisite to payment under the policy. Two weeks later, on January 24, 2024, Mr. Horace sued Cincinnati. Two weeks after that, on February 7, 2024—thirty-six days after he made a claim under the Policy—Mr. Horace accepted Cincinnati's actual-cash-value counteroffer of $41,709.10. He then mailed the title to the Truck to Cincinnati, which it received on February 12, 2024. By the next day, Cincinnati had mailed Mr. Horace a check for $41,709.10.

In this lawsuit, Mr. Horace, who is representing himself,[2] asserts claims for (1) breach of

---

under § 10-3-1116, including attorney's fees, exceeded the $75,000 amount in controversy), *report and recommendation adopted*, 2013 WL 1414241 (D. Colo. Apr. 8, 2013).

[2] Mr. Horace is a licensed attorney who works at Frascona Joiner Goodman & Greenstein PC in Boulder, Colorado, and so his filings are not entitled to the liberal construction ordinarily afforded to pro se litigants. *See, e.g.*, *Mann v. Boatright*, 477 F.3d 1140, 1148 n.4 (10th Cir.

contract; (2) unreasonable delay or denial of insurance benefits under Colorado Revised Statutes §§ 10-3-1115 and 10-3-1116; and (3) declaratory judgment. ECF No. 3 ¶¶ 36-41, 53-61.[3] Now, in competing Motions, both sides seek judgment in their favor on all remaining claims. The Motions are fully briefed, *see* ECF Nos. 49, 50, 53, 54, and the court considers them below.

## UNDISPUTED MATERIAL FACTS

As a preliminary matter, the court addresses a procedural issue stemming from Cincinnati's decision to make no substantive response to the facts Mr. Horace presented in support of his Motion (ECF No. 40-1). The entirety of Cincinnati's response to Mr. Horace's Motion consists of four sentences:

> Plaintiff's Motion for Summary Judgment should be denied. As an initial matter, the only remaining claim is his claim for statutory benefits. He has no breach of contract and common law bad faith claim. Accordingly, Cincinnati incorporates by reference pursuant to Rule 10(c) its response.[4] Plaintiff has not stated a cause of action and it should be dismissed.

ECF No. 50. In Cincinnati's view, Mr. Horace's Motion and his response to Cincinnati's Motion (ECF No. 49) raise duplicative arguments, *see* ECF No. 54 at 2 n.2, and so "the same reasons why summary judgment should be granted in favor of Cincinnati . . . apply for why [Mr.

---

2007) ("While we generally construe pro se pleadings liberally, the same courtesy need not be extended to licensed attorneys.") (quotation omitted).

[3] The court previously dismissed Mr. Horace's claim alleging a violation of the "unfair claim settlement practices act," Colo. Rev. Stat. § 10-3-1104(1), a provision within the Colorado Unfair Competition-Deceptive Practices Act, *see* ECF No. 3 ¶¶ 42-52, for lack of a private right of action. ECF No. 30.

[4] The court is uncertain what Cincinnati means by "its response," and it is likewise unclear that Federal Rule of Civil Procedure 10(c) is applicable in this context. *See* Fed. R. Civ. P. 10(c) ("A statement *in a pleading* may be adopted by reference elsewhere in the same pleading or in any other pleading or motion.") (emphasis added).

Horace's] Motion fails as a matter of law." *Id.* (citation modified). In light of these circumstances, Cincinnati asserts, it was not obliged to respond to Mr. Horace's Motion— including his statement of undisputed facts—because "no defense to an insufficient showing is required." *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161 (1970)).

Mr. Horace counters that Cincinnati's silence in response to his Motion contravenes this court's practice standards. ECF No. 53 at 2.[5] More importantly, Mr. Horace invokes Rule 56(e), asking the court to find that Cincinnati "has conceded [his] uncontroverted material facts." *Id.* at 3; *see also* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion."). The court respectfully declines to exercise this discretionary option. *See Stella v. Anderson*, 844 F. App'x 53, 58 (10th Cir. 2021) ("Considering uncontested facts as undisputed under Rule 56(e)(2) is just one of four options that Rule 56(e) affords to district courts."); *see also* Fed. R. Civ. P. 56(e)(4) (including among the four options the court's ability to "issue any other appropriate order").

The Tenth Circuit Court of Appeals has made clear that "a party's failure to file a response to a summary judgment motion is not, by itself, a sufficient basis on which to enter judgment against the party." *Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002). "Instead, the

---

[5] "Any party opposing the motion for summary judgment shall include a separate section in its response admitting or denying each of the moving party's undisputed facts. Each admission or denial shall be contained in a separately numbered paragraph corresponding to the moving party's paragraph numbering. Each denial shall be accompanied by a brief factual explanation and a specific reference to evidence in the record supporting the denial." D.C.COLO.MJ V § 10, Additional Individual Requirements or Instructions for Motions for Summary Judgment for Magistrate Judge Prose).

district court 'must make the additional determination that judgment for the moving party is appropriate under Rule 56.' To do so, the Court must determine that the moving party has made a sufficient factual showing and legal argument to justify granting summary judgment even if no opposing brief is submitted[.]'" *United States v. Jackson*, No. CIV-11-406-D, 2012 WL 5292952, at *1 (W.D. Okla. Aug. 21, 2012) (quoting *Reed*, 312 F.3d at 1195). "That assessment requires consideration of the claims in conjunction with the unchallenged facts while remaining cognizant of the relevant burdens." *Wilmington Sav. Fund Soc'y, FSB, as Owner Tr. of the Residential Credit Opportunities Tr. VIII-A v. Jaramillo*, No. 1:24-CV-00104-MLG-KK, 2026 WL 1091789, at *2 (D.N.M. Apr. 22, 2026). "If the evidence produced in support of the summary judgment motion does not meet this burden, 'summary judgment must be denied even if no opposing evidentiary matter is presented.'" *Adamson v. Lyons*, No. 8-CV-420 WJ/KBM, 2010 WL 11590711, at *2 (D.N.M. June 2, 2010) (quoting *Adickes*, 398 U.S. at 160).

Applying these principles to the case at hand, the court has examined each and every factual averral, and the evidence submitted in support of each of them, contained in the summary judgment briefing (including those which Cincinnati contends need not be credited). From that review, the court identifies the following properly-supported material facts, which are undisputed unless otherwise noted:

***Terms of the Policy***

1.    Cincinnati issued to Mr. Horace automobile insurance policy number A03 0923011, which was in effect from March 1, 2023, to March 1, 2024 (the "Policy"). ECF No. 41-1.

2. The Policy contained a "Capstone Auto Endorsement,"[6] which included these definitions:

> B. "Total loss" means direct and accidental loss including theft, covered by this policy, to "your covered auto" where the cost to repair the damaged auto plus the salvage value equals or exceeds the cash value of the auto, unless otherwise defined by governing statute or regulation.
>
> C. For those vehicles identified as being subject to "agreed value" on the Declarations, "agreed value" means the amount that "you" and "we" agree on for "your covered auto". "You" agree that "we" may change this amount when the policy is renewed to reflect current costs and values.

*Id.* at 16.[7]

3. For vehicles subject to an "Agreed Value," like Mr. Horace's, the Policy provided:

> For those vehicles identified as being subject to "agreed value" on the Declarations Part D - Coverage for Damage to Your Auto, Limit of Insurance is deleted and replaced by:
>
> **LIMIT OF INSURANCE**
>
> "Our" limit of insurance for loss to "your covered auto" shall be the lesser of:
>
> > A. Amount necessary for repair; or
> >
> > B. The "agreed value" shown in the Declarations. "You" agree that "we" may change this amount when the policy is renewed to reflect current costs and values.
>
> If a repair results in better than like kind or quality, "we" will not pay for the amount of the betterment.

---

[6] References here to the "Policy" include the endorsement.

[7] Page references are to the pagination in the .pdfs for each docket entry.

6

> **In the event of a "total loss" to "your covered auto", "we" will pay the higher of the "agreed value" or the actual cash value at the time of loss.**
>
> No deductible applies to this insurance coverage feature when loss is due to "total loss" to "your covered auto".
>
> **CASH SETTLEMENT OPTION**
>
> In the event of a covered loss that "we" determine results in "physical damage" of 50% or more of the "agreed value" listed on the Declarations for a particular vehicle, **"you" will have the option to take a cash settlement in the amount of the "agreed value" in exchange for the title to the vehicle, which "you" must transfer to "us"**. With respect to this settlement option only, "physical damage" means the actual physical damage to the vehicle listed, and does not include any loss of value or expected rental costs.

*Id.* at 20 (emphasis added).

4.  Under the Policy, the Truck—a 2016 Ford F-150 Supercrew pickup—was assigned an agreed value of $35,024. *Id.* at 23.

5.  Additionally, the Policy provided coverage for "temporary transportation expenses incurred by 'you' in the event of a loss to 'your covered auto'," without application of a deductible, up to a maximum of $15,000. *Id.* at 17.

6.  The Policy stated that payment for "Transportation Expenses" "will be limited to that period of time reasonably required to repair or replace the 'your covered auto' . . ." *Id.* at 35.

7.  The Policy imposed no daily expense limit for rental vehicles. ECF No. 40-12 at 1 ("While your car is being repaired after a covered loss, you receive a rental with no daily expense limit.").

***January 1 to January 23, 2024: The Accident and Prelitigation Negotiations***

8.  On January 1, 2024, the Truck was rear-ended. ECF No. 3 ¶ 9.

9.     Mr. Horace reported the loss to Cincinnati on January 2, 2024, and a claim was opened. *Id.* ¶ 12.

10.     On January 3, 2024, Matt Russell, who is identified as Cincinnati's "Agent" and a "Field Claim Specialist," *id.* ¶ 13, completed the repair estimate and valuation and advised Mr. Horace that the Truck was a total loss. Defendant's Statement of Undisputed Material Facts, ECF No. 41 ¶ 8.

11.     Also on January 3, 2024, Mr. Horace submitted receipts for vehicle parts he asserted were lost or damaged in the collision, along with the mileage on the Truck at the time of the accident. *Id.* ¶ 9; ECF No. 3 ¶ 14.

12.     On January 9, 2024, Mr. Russell emailed Mr. Horace: "As far as your total loss payment – I sent the request on 1/4/2024 to revise the valuation with the new mileage and still waiting to hear back. I escalated the problem yesterday and again today – again I have never had this take longer than 24 hours and hope to have it resolved soon." ECF No. 40-4 at 3.

13.     On January 10, 2024, Mr. Russell informed Mr. Horace that Cincinnati had calculated the replacement value of the Truck as $36,467.88, but offered Mr. Horace $39,773.09 to replace the vehicle, which included waiving the $1,000 deductible. ECF No. 41 ¶ 13.

14.     The $36,467.88 did not include title fees. Response to Plaintiff's Additional Material Facts, ECF No. 54 ¶ 40.

15.     Consistent with the Policy, Mr. Russell informed Mr. Horace that he "will need the title in my possession prior to releasing any payments," which "can be forwarded to my PO Box below." ECF No. 41-5 at 3.

16.     Mr. Horace did not agree to the number offered by Cincinnati. Approximately

thirty minutes after Cincinnati sent the first email on January 10, 2024, Mr. Horace responded. ECF No. 40-4 at 4-5.

17.     In that email, Mr. Horace informed Cincinnati that he believed the "Market Driven Value" of the Truck reflected in the January 10 offer was actually $33,580, which "is less than the 'Agreed Value,'" *id.* at 4, and that the agreed value of the Truck was due and owing at that time":

> I believe based on the offer provided, the policy language, and the longer than "ever" response time, there has been, and continues to be, an unreasonably [sic] delay in payment of the undisputed portion of my claim. Cincinnati advertised, and I paid for the simplest of valuation policies so that this situation would not occur. Yet, here we are.

*Id.* at 5.

18.     Later in the day on January 10, 2024, 2024, Cincinnati countered with an offer of $39,793.09 to replace the Truck, which reflected an additional "$20 to your total payment for title/transfer fees, . . . the standard amount we include on all total loss payments," and Mr. Russell asked Mr. Horace to let him know if he "incur[s] any other fees regarding registration." ECF No. 41-5 at 4.

19.     One week later, on January 17, 2024—after receiving no response from Mr. Horace—Cincinnati followed up with him to find out if he agreed with the $39,793.09 valuation. ECF No. 41 ¶ 16; ECF No. 41-5 at 6 (in email from Russell to Horace, stating: "Hi, Ryan, Hope you had a nice weekend – following up on the below valuation. Please let me know if you are in agreement so I can submit payment.").

20.     Mr. Horace did not agree. He responded by email on January 17:

9

> As to the value of the vehicle, Cincinnati has still not offered a valuation based upon Agreed Value, per the policy. Your provided paperwork ("Market-Drive [sic] Valuation") shows that the offer of $36,467.88 . . . was based on Actual Cash Value/ "Market Driven Value" of $33,5080 (herein "Base Vehicle Value"), plus the estimated tax of 8.6%, less $1,000 deductible, to total $35,467.88 (to which the deductible was then waived per the policy). To date, Cincinnati has unreasonably delayed and refused to pay the Agreed Value.

ECF No. 40-4 at 2.

21.     In the same email, Mr. Horace stated that he was "willing to exchange the title for this undisputed amount [of the agreed valued of $35,024], but Cincinnati, per C.R.S. 10-4-639,[8] would still need to make an offer of title, tax, and registration fees, in addition to an updated valuation of the Equipment/Property." ECF No. 41-5 at 8.

22.      Also on January 17, 2024, Mr. Horace submitted additional invoices for "Equipment/Property" which had not been included in the $36,467.88 replacement value calculation. ECF No. 41 ¶ 17; ECF No. 41-5 at 7-8; Plaintiff's Statement of Additional Material Facts, ECF No. 49 ¶ 37.

23.     On January 19, 2024, after considering Mr. Horace's request for reimbursement for additional "Equipment/Property," Cincinnati upped its offer to Mr. Horace to $40,040.79. ECF No. 41-6 at 1-2; *see also* ECF No. 40-5 at 6 (same).

24.     Additionally, on January 19, 2024, Cincinnati sent an electronic payment to Mr.

---

[8] Mr. Horace referenced Colorado's "Total Loss Statute," which "imposes an affirmative duty on motor vehicle insurers: they 'shall pay' to the insured the title and registration fees 'associated with the total loss of [the insured's] motor vehicle.'" *Trudgian v. LM Gen. Ins. Co.*, 558 P.3d 974, 975 (Colo. App. 2024) (quoting § 10-4-639(1)). In *Trudgian*, which was issued on August 8, 2024, the Colorado Court of Appeals confirmed that no implied private right of action exists to enforce § 10-4-639(1). *Id.* at 979.

Horace of $17,512, or half of $35,024—the "Agreed Value" in the Policy— "in an act of good faith." ECF No. 41-6 at 2. Mr. Russell explained Cincinnati's thinking in this manner:

> When there is an agreed value listed on the policy that is the amount we pay for the auto in the event of a total loss—with no sales tax or fees added. We also run an AutoSource that provides us a like, kind, and quality valuation for vehicles in the area—sales tax and fees are added to this amount. Cincinnati pays the higher of these two amounts and I checked with my supervisor on this to confirm. The AutoSource valuation is higher than your agreed value so we are offering $36,467.88 instead of the agreed value to replace the F150. I will agree to pay half of the $35,024 agreed value in an act of good faith, but will still need the title in my possession prior to releasing the balance. Apologies if that statement was interpreted as a refusal to pay—it was more of a statement letting you know I can't release any payment until we have the title in our possession and we can work through negotiating the balance for the total loss payment. I have sent an e-payment for the amount of $17,512 to your email address that can be direct deposited into your account. What time do you want to meet on Monday for the title swap?

*Id.*; *see also* ECF No. 40-5 at 6 (same).

25.    AutoSource is "a market-driven evaluation" based on "a market analysis for similar vehicles in the geographic region, and that's where they come up with the valuation." Deposition of Keith Gearlds,[9] ECF No. 40-1 at 38:17-23; *id.* at 60:1-2 ("The actual cash value from Autosource is the market-driven value of the vehicle.").

26.    Cincinnati's explanation for not paying the entire agreed value of $35,024 on January 19, 2024, was that the claim was in dispute:

> Q. Is there a reason that Cincinnati would not pay the agreed value at the time pending further negotiation on whether any higher amount was owed?
>
> A. It was a disputed claim. The agreed value wasn't the proper measure of damage.

---

[9] Mr. Gearlds, who served as Cincinnati's designated witness pursuant to Federal Rule of Civil Procedure 30(b)(6), is an assistant vice president in Cincinnati's casualty claims department. ECF No. 40-1 at 5:22-24.

So Mr. Russell, in an act of good faith, agreed to pay a portion of the claim for Mr. Horace.

Gearlds Depo., ECF No. 49-1 at 47:23-48:4.

27.    On January 23, 2024, Mr. Horace informed Mr. Russell that he would be suing Cincinnati and that he had already drafted the complaint. ECF No. 40-5 at 6.

28.    The same day, Mr. Russell responded that Cincinnati will be "releasing the remaining half of the total loss payment," instructed Mr. Horace to have the Truck ready for salvage pick-up, and told him that "now that we have completed the total loss payment, your rental will be due back by 1/30/2024." *Id.*

29.    On January 23, 2024, Mr. Horace responded that Cincinnati's position was "not acceptable" to him; that he did "not agree on the total loss payment, other than the undisputed amount"; that he did not consent to removal of the Truck until full payment was received; and that Cincinnati's handling of the rental cutoff was "a deceptive tactic in an attempt to settle claims." *Id.* at 7.

30.    On January 23, 2024, Mr. Russell responded that "[o]ur rental payments are only owed to policy holders until you receive the total loss payment. I gave you an extra week out of courtesy as CAPSTONE policy holder. Since you are filing suit and are unwilling to negotiate I will consider it a [sic] owner retained salvage and will be stopping the rental 1/30/24. Any charges past 1/30/24 will be your responsibility." *Id.*

***January 24, 2024: Mr. Horace Files Suit Against Cincinnati***

31.    Mr. Russell sued Cincinnati in Adams County District Court on January 24, 2024. ECF No. 3 at 1.

*February 6 to February 22, 2024: Post-Litigation Negotiations and Payment of Actual Cash Value for the Truck*

32.    After Mr. Horace sued Cincinnati, the parties continued to negotiate. ECF No. 41-8 at 2-5 (emails exchanged between Russell and Horace on February 6-7, 2024).

33.    On February 7, 2024, Mr. Horace accepted Cincinnati's actual-cash-value offer of $41,709.10 for the total loss of the Truck. *Id.* at 2.

34.    Mr. Horace mailed Cincinnati the title to the Truck, which it received on February 12, 2024. ECF No. 41 ¶ 25.

35.    By February 13, 2024, Cincinnati had mailed Mr. Horace a check for the balance of the total loss payment. ECF No. 41-8 at 1 (informing Horace that "[t]he balance for your total loss payment has been submitted and you should received [sic] within 5-7 business days at your address on file – totals below").[10]

36.    Mr. Horace deposited the check on February 22, 2024. ECF No. 41 ¶ 27.

***Payment of Mr. Horace's Transportation Expenses***

37.    Cincinnati paid Mr. Horace's transportation expense benefits in the amount of $ 313.18 per week for a vehicle rental from January 4 to February 2, 2024. ECF No. 49 ¶ 53; ECF No. 54 ¶ 53.

38.    After Mr. Horace had agreed to the actual cash value of $41,709.10, he rented a Mercedes GLC 300 from February 8 to February 28, 2024, for $963.56. ECF No. 41 ¶ 29; Horace Depo., ECF No. 41-7 at 32:8-17. He submitted the invoice for the Mercedes rental to Cincinnati on March 14, 2024, as part of his initial disclosures in the instant action under Federal

---

[10] The totals were labeled as "Initial payment: $17,512.00; Owner retained salvage: $7,641.16; Net total loss payment: $16,555.94; Total: $41,709.10." ECF No. 41-8 at 1.

Rule of Civil Procedure 26(a)(1). ECF No. 41 ¶ 30.

39.     Mr. Horace rented a Maserati SUV from March 3, 2024, to March 22, 2024, for $937.40. ECF No. 41 ¶ 29; ECF No. 41-10. He submitted the invoice for the Maserati rental to Cincinnati on September 20, 2024, as part of his first supplemental disclosures in this case under Rule 26(a)(1). ECF No. 41 ¶ 31.

40.     On November 26, 2024, Cincinnati sent Mr. Horace a check for $1,900.96, which covered the complete rental costs for the Mercedes and the Maserati. ECF No. 41-14.

### LEGAL STANDARD

The purpose of summary judgment is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation modified).

"Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard," *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019), but this standard applies differently depending on whether the movant bears the burden of persuasion at trial. A movant who does not bear the burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point the court to a lack of evidence for the other party on an essential element of that

party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted). To satisfy this burden, the nonmovant must point to competent summary judgment evidence creating a genuine dispute of material fact; conclusory statements based on speculation, conjecture, or subjective belief are insufficient. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). However, "if the moving party has the burden of proof [at trial], a more stringent summary judgment standard applies." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). A moving party who bears the burden at trial "must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Id.*[11]

---

[11] Mr. Horace asserts that the moving party must show "beyond a reasonable doubt" that it is entitled to summary judgment. ECF No. 40 at 3 (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). Although cast in slightly different verbiage, there is no fundamental difference between Mr. Horace's articulation of the summary judgment standard and the principles governing the summary judgment analysis described by the court here. *See Liberty Lobby*, 477 U.S. at 252 (in likening the summary judgment standard to the beyond-a-reasonable-doubt standard in the criminal context, observing that the court asks on summary judgment "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict," and that "this is no different from the consideration of a motion for acquittal in a criminal case, where the beyond-a-reasonable-doubt standard applies and where the trial judge asks whether a reasonable jury could find guilt beyond a reasonable doubt") (citation modified); *see also United States v. Garcia*, 919 F.3d 489, 491 (7th Cir. 2019) (taking note of "the connection between the roles that judges play in criminal cases, requiring proof beyond a reasonable doubt, and in civil cases, where motions for summary judgment and for judgment as a matter of law require judges to evaluate the outer limits of reasonable inferences under the lower civil standard of proof by a preponderance of the evidence").

In considering the evidence in the summary judgment record, the court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the court views the summary judgment record in the light most favorable to the nonmoving party. *Banner Bank*, 916 F.3d at 1326.

## DISCUSSION

Mr. Horace's remaining claims are for breach of contract, statutory bad faith, and declaratory judgment. ECF No. 3 ¶¶ 36-41, 53-61. However, in his papers, Mr. Horace argues that he is entitled to summary judgment on a common law bad faith theory, *see* ECF No. 40 at 3-4; 8-9; ECF No. 49 at 9-10, 12-14; ECF No. 53 at 5-6—a claim he did *not* plead. *See generally* ECF No. 3. The court begins by addressing the legal impact of raising this new theory of recovery at the summary judgment stage, then analyzes in turn the claims Mr. Horace actually included in his pleading, to determine whether either party has shown an entitlement to summary judgment.

## I.    Mr. Horace Has Not Raised A Common Law Bad Faith Claim

In analyzing the procedural conundrum created by Mr. Horace's attempt to raise a heretofore-unpled claim at the summary judgment stage, the court begins by recognizing that the claim he *did* plead, for statutory unreasonable delay or denial of insurance benefits under § 10-3-1115, is "similar, but meaningfully distinct" from the claim he did *not* plead but now seeks to pursue: for common law bad faith breach of his contract with Cincinnati. *See Byron-Amen v. State Farm Mut. Auto. Ins. Co.*, No. 21-cv-02364-NYW, 2022 WL 1567563, at *4 (D. Colo. May 18, 2022).

While both claims require a showing of unreasonable delay on the part of the insurer,

*McKinney v. State Farm Mut. Auto. Ins. Co.*, No. 20-cv-01651-CMA-KLM, 2021 WL 4472921, at *4 (D. Colo. Sept. 30, 2021), a common law bad faith claim additionally requires the insured establish "that the insurer knowingly or recklessly disregarded the validity of the insured's claim[.]'" *Butman Fam. Inv. Ltd. P'ship v. Owners Ins. Co.*, No. 19-cv-01638-KLM, 2020 WL 1470801, at *8 (D. Colo. Mar. 25, 2020) (quoting *Fisher v. State Farm Mutual Automobile Ins. Co.*, 419 P.3d 985, 990 (Colo. App. 2015), *aff'd*, 418 P.3d 501 (Colo. 2018)). "In other words, a common law bad faith claim requires a showing that the insurer *subjectively* knew of, or recklessly disregarded, the unreasonableness of its conduct." *Byron-Amen*, 2022 WL 2567563, at *4 (citations omitted). Put simply, a claim under § 10-3-1115 and a common law bad faith claim are distinct causes of action.

Mr. Horace cannot bring forward this new theory of liability at the summary judgment phase of the case. To do so would require an amendment of his pleading. Although new claims first raised in summary judgment briefing have sometimes been treated as a de facto request to amend, *see Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090-91 (10th Cir. 1991), such an amendment is permissible only where "a late shift in the thrust of the case will not prejudice the other party in maintaining its defense." *Ahmad v. Furlong*, 435 F.3d 1196, 1202 (10th Cir. 2006) (quotation omitted).

Here, the record shows that Cincinnati would suffer significant prejudice by the court's permitting a constructive amendment through the late-stage mechanism of summary judgment briefing. Had Cincinnati been apprised from the outset of a common law bad faith claim in the complaint that has served as the operative pleading since the commencement of this litigation, it reasonably might have pursued a different litigation strategy. For starters, it might have moved to

17

dismiss that claim under Federal Rule of Civil Procedure 12(b)(6), there being no allegations in the operative complaint that Cincinnati acted "knowingly" or "recklessly"[12] in negotiating with Mr. Horace to settle for the actual cash value of the Truck thirty-seven days after the accident and mailing him a check to cover the remainder of that amount immediately upon its receipt of title to the Truck. *See* Undisputed Material Facts 33-35. Even if Cincinnati had decided not to seek dismissal of a common law bad faith claim, it might have adjusted its approach in discovery to take into account the existence of the distinct requirements for proving such a claim, including in crafting its responses to written discovery requests, in preparing Mr. Gearlds (its Rule 30(b)(6) designee) for deposition, and, perhaps, in asking Mr. Horace pointed questions in his deposition about the specific conduct he deemed to be "reckless." And the record provides no reason to doubt that Cincinnati would have included a common law bad faith claim in its request for summary judgment, which it was unable to do because Mr. Horace did not plead it. *See* ECF No. 41 (seeking summary judgment on Horace's remaining breach of contract, statutory bad faith, and declaratory judgment claims). Thus was Cincinnati deprived of the ability to request pretrial disposition of a claim not explicitly revealed by Mr. Horace until after discovery had closed and dispositive motions were filed.

It may be that, in Mr. Horace's haste to reach the courthouse, he inadvertently omitted from his pleading a reference to a common law bad faith claim. But that error, if it was an error,

---

[12] Neither term is used in the complaint. *See generally* ECF No. 3; *see also* ECF No. 54 at 8 ("The operative causes of action in the Complaint do not include a claim for common law bad faith [Doc. 3]. Indeed, the Complaint does not contain any mention of 'common law bad faith', or any version of 'knowing' or 'reckless disregard', which is an element of a common law bad faith claim.").

does not eliminate the prejudicial impact on Cincinnati of generating such a claim now, nor does it excuse Mr. Horace's failure to repair that pleading deficit at some point before discovery closed. A plaintiff may not "wait until the last minute to ascertain and refine the theories on which they intend to build their case." *Evans*, 936 F.2d at 1091 (recognizing that such a practice "would waste the parties' resources, as well as judicial resources, on discovery aimed at ultimately unavailing legal theories and would unfairly surprise defendants, requiring the court to grant further time for discovery or continuances"). Here, Mr. Horace has done just that, with the unduly-delayed presentation of his new claim emphasizing the prejudice to Cincinnati were the court to approve it. *See, e.g.*, *Low v. OMNI Life Sci., Inc.*, No. CIV-18-305-SLP, 2025 WL 781456, at *8 n.20 (W.D. Okla. Mar. 11, 2025) (holding that plaintiffs were not "permitted to assert [now] a claim for breach of contract based on those prior agreements in response to a summary judgment motion") (citing *Navajo Nation Hum. Rights Comm'n v. San Juan Cnty.*, 281 F. Supp. 3d 1136, 1149 (D. Utah 2017) ("[T]he liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a) . . . does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage.") (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004) (per curiam)); *R.C. by S.P. v. J.C.*, 736 F. Supp. 3d 1050, 1057 n.16 (D. Kan. 2024) ("Plaintiff appears to assert a breach of contract claim under a theory that Travelers failed to act in good faith and with reasonable care when it evaluated J.C.'s insurance claim. This is raised for the first time in Plaintiff's briefing for his summary judgment motion. A motion for summary judgment is not the appropriate vehicle to raise a new claim.") (citation omitted), *appeal dismissed*, No. 24-3096, 2025 WL 1905327 (10th Cir. Jan. 15, 2025).

Consistent with this well-established authority, this court declines to countenance a

newly-asserted common law bad faith claim, which emerged for the first time in Mr. Horace's summary judgment briefing and was not properly raised in the course of this litigation. The court therefore turns to an evaluation of the claims Mr. Horace has raised and on which one or both of the parties seek summary judgment.

## II.    Mr. Horace's Breach of Contract Claim Is Moot

Cincinnati moves for summary judgment on Mr. Horace's breach of contract claim, asserting that its satisfaction of all contractual obligations under the Policy cannot genuinely be disputed and, further, that Mr. Horace has conceded as much in acceding to the assertion that "[b]esides the Vehicle and transportation expenses that have already been paid, Plaintiff is not seeking any other contractual amounts." ECF No. 41 ¶ 33; *see also id.* at 10 (arguing that "[t]he breach of contract claim must be dismissed as a matter of law because Cincinnati has performed under the contract and Plaintiff concedes nothing further is owed under the Policy"). In his Motion, Mr. Horace does not affirmatively seek summary judgment on the breach of contract claim, *see generally* ECF No. 40, but he counters in response to Cincinnati's Motion that the claim survives in spite of Cincinnati's fulfillment of its contractual obligations. ECF No. 49 at 12.

To prevail on a claim for breach of contract under Colorado law, a plaintiff must prove: (1) the existence of a contract; (2) the plaintiff's performance of its obligations under the contract; (3) the defendant's failure to perform its obligations; and (4) resulting damages. *See Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA), Inc.*, 958 F. Supp. 2d 1238, 1243 (D. Colo. 2013) (citing *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)). Cincinnati indisputably paid Mr. Horace the actual cash value of the Truck and the transportation

20

expenses he incurred, *see* Undisputed Material Facts 35, 36, 37, 40, thus negating his ability to dispute that Cincinnati performed its obligations under the Policy. But Mr. Horace asserts that these payments do not moot his claim because "other damages and costs are awardable to Plaintiff as the prevailing party." ECF No. 49 at 12 (citing *Goodson v. Am. Standard Ins. Co.*, 89 P.3d 409, 414-15 (Colo. 2004); Fed. R. Civ. P. 54(d)(1)). Mr. Horace's argument is unavailing.

Mr. Horace presumably invokes *Goodson's* reference to the availability of damages for emotional distress, but the Court specifically cabined that holding to claims for bad faith breach of insurance contract. *Goodson*, 89 P.3d at 414 ("We hold that, *in a tort claim against an insurer for breach of the duty of good faith and fair dealing*, the plaintiff may recover damages for emotional distress without proving substantial property or economic loss.") (emphasis added). As this court has explained, Mr. Horace did not plead such a claim and is precluded from making an eleventh-hour pitch for it in a response to a motion for summary judgment. Too, any supposed entitlement to some other form of damages—recovery of attorney's fees or interest, say—would not serve to resurrect Mr. Horace's defunct general breach of contract claim where Cincinnati has paid the Policy benefits in full. *Redus v. State Farm Mut. Auto. Ins. Co.*, No. CIV-17-724-W, 2018 WL 8755502, at *2 n.3 (W.D. Okla. Jan. 9, 2018) (rejecting argument that insured prevailed on a breach of contract claim because the insurer paid her benefits in full, thus entitling her "to recover attorney fees, costs": "Due to State Farm's payment of [uninsured motorist] and med-pay benefits in full, Redus lacks evidence of damages—the third essential element [of a breach of contract claim]; accordingly, Redus cannot prevail on this claim for relief and is therefore not entitled to an award of attorney fees, costs or pre-and post-judgment interest in connection with this claim since her entitlement, if any, to the same is dependent on her status as

a prevailing party."). Mr. Horace thus has no viable breach of contract claim.

It remains for the court to decide the appropriate procedural disposition of the breach of contract claim. Without question, Cincinnati's payment of the amounts due under the Policy (and the concomitant elimination of breach of contract damages suffered by Mr. Horace) compels the conclusion that the claim does not survive summary judgment. However, there is also no doubt that when Mr. Horace filed this lawsuit on January 23, 2024, Cincinnati had not yet made those payments. Undisputed Material Facts 35, 36, 40. This undisputed factual timeline thus would appear to implicate mootness under Article III of the United States Constitution, which "is grounded in the requirement that any case or dispute that is presented to a federal court be definite, concrete, and *amenable to specific relief*." *Jordan v. Sosa*, 654 F.3d 1012, 1024 (10th Cir. 2011) (citation omitted). Notably, notwithstanding its full payment of monies due under the Policy following the initiation of this lawsuit, Cincinnati does not mention mootness in its Motion, ECF No. 41 at 10; it is Mr. Horace who first uses the term in his response to Cincinnati's Motion. ECF No. 49 at 12 (arguing that payment "does not moot Plaintiff's claim for common law bad faith breach of contract"—the claim he did not raise). In reply, Cincinnati again does not focus on the mootness question, but points instead to the fact that "it is undisputed Plaintiff does not seek additional benefits under the insurance policy," requiring that "the first cause of action for breach of contract should be dismissed as a matter of law." ECF No. 54 at 8.

Notwithstanding the parties' lack of engagement with the mootness question, the undersigned must ascertain whether Mr. Horace's breach of contract claim for damages has been rendered moot by Cincinnati's actions because a court has "no subject-matter jurisdiction if a case is moot." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th

22

Cir. 2010); *see also Collins v. Daniels*, 916 F.3d 1302, 1314 (10th Cir. 2019) (explaining that a court must decide whether a case is moot as to "each form of relief sought," and that it is the plaintiff's burden to demonstrate that "standing for each form of relief sought . . . exists at all times throughout the litigation") (citation modified). "The crucial question" in evaluating mootness "is whether granting a present determination of the issues offered will have some effect in the real world." *Brown v. Buhman*, 822 F.3d 1151, 1165-66 (10th Cir. 2016) (quotation omitted).

In applying these principles, courts in this District routinely conclude that breach of contract claims are rendered moot by payment of the full amount of benefits due under the policy—which Mr. Horace indisputably has received here. *See, e.g.*, *Uhl v. Progressive Direct Ins. Co.*, 765 F. Supp. 3d 1176, 1183 (D. Colo. 2025) (recognizing that "coverage is no longer in play after Progressive's unconditional payment of policy limits, which mooted any potential breach of contract claim"); *Slavin v. Garrison Prop. & Cas. Ins. Co.*, No. 14-cv-01839-LTB-KMT, 2017 WL 2928030, at *3 (D. Colo. July 10, 2017) ("Plaintiff concedes that such stipulation by the parties as to the amount of the covered benefit, and that defendant has paid plaintiff for the amount assessed by the Appraisal Award, renders his breach of contract claim no longer cognizable. Because the amount of the covered benefit in this case is no longer in dispute and, in turn, plaintiff's contract claim is [no] longer at issue, evidence of the Appraisal Award process and amount is not relevant for the purpose of assessing the amount of the 'covered benefit' by the jury.") (citation modified), *aff'd*, 805 F. App'x 561 (10th Cir. 2020); *Galinkin v. Safeco Ins. Co. of Am.*, No. 21-cv-02855-REB-SKC, 2022 WL 18777079, at *4 n.9 (D. Colo. Dec. 21, 2022) ("Payment of the full amount of the benefits due under the contract essentially

moots plaintiffs' claim for breach of contract.") (citations omitted); *see also Nematpour v. GEICO Gen. Ins. Co.*, No. CIV-15-851-W, 2016 WL 9022592, at *1 (W.D. Okla. May 24, 2016) (granting summary judgment on breach-of-contract claim after insurer tendered the policy limits in full, rendering the contract claim moot because the plaintiff could no longer show contract damages); *Watson v. Farmers Ins. Co.*, 23 F. Supp. 3d 1342, 1351 (N.D. Okla. 2014) (granting summary judgment in favor of defendant insurer where "[t]he defendant's payment of policy limits renders plaintiff's breach of contract claim moot, because plaintiff cannot show that he has contract damages").

The record here reveals no reason to question that factual developments during the course of this litigation mooted Mr. Horace's breach of contract claim. The undisputed facts confirm that Cincinnati paid the $41,709.10 actual cash value of the Truck, which Mr. Horace accepted, and reimbursed the $1,900.96 transportation expenses he documented for February and March 2024 (as well as the transportation expenses he incurred in January 2024 in the immediate aftermath of the accident), and Mr. Horace has confirmed that he seeks no contractual benefits other than those Cincinnati already has paid. ECF No. 41 ¶ 33; ECF No. 49 ¶ 33. There is no remaining benefit for this court to order Cincinnati to pay and no contractual damages left to remedy, and thus any live controversy as to this claim has been extinguished. Put otherwise, the court's formulating a ruling on the breach of contract claim would have no "effect in the real world." *See Brown*, 822 F.3d at 1165-66.

Accordingly, because Mr. Horace's breach of contract claim had become moot prior to final adjudication, the claim will be **dismissed without prejudice as moot**. *See, e.g.*, *Lamle v. Eads*, 134 F.4th 562, 566 (10th Cir. 2025) (remanding with instructions to vacate a judgment and

dismiss a moot claim without prejudice "[b]ecause mootness is jurisdictional"); *Brown*, 822 F.3d at 1179 n.27 ("Because this case became moot 'prior to final adjudication,' *Rio Grande Silvery Minnow*, 601 F.3d at 1128 n.19, vacatur and dismissal without prejudice are appropriate.").

## III.    Cincinnati Is Entitled to Summary Judgment on the Statutory Bad Faith Claim

Both sides move for summary judgment on Mr. Horace's claim for insurance bad faith under Colorado Revised Statute § 10-3-1115. ECF No. 40 at 8-16; ECF No. 41 at 10.

### A.    Applicable Law

"To prevail on a statutory bad faith claim, a plaintiff must prove that the insurer unreasonably delayed or denied payment of the claim." *Foster v. USAA General Indem. Co.*, No. 22-cv-00378-PAB-MDB, 2022 WL 17583423, at *3 (D. Colo. Dec. 12, 2022) (citing *Vaccaro v. Am. Family Ins. Grp.*, 275 P.3d 750, 756 (Colo. App. 2012); Colo. Rev. Stat. § 10-3-1115(1)(a) ("A person engaged in the business of insurance shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant.")). An insurer's delay is unreasonable "if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action." Colo. Rev. Stat. § 10-3-1115(2). "What constitutes reasonableness under the circumstances is ordinarily a question of fact for the jury. However, in appropriate circumstances, as when there are no genuine issues of material fact, reasonableness may be decided as a matter of law." *Fisher*, 419 P.3d at 992 (quotation omitted). The burden to establish unreasonableness lies with the plaintiff. *Williams v. Owners Ins. Co.*, 621 F. App'x 914, 919 (10th Cir. 2015).

"Although not outcome determinative, *see Fisher v. State Farm Mutual Automobile Insurance Co.*, 419 P.3d 985, 989-90 (Colo. App. 2015) ('*Fisher I*'), *aff'd*, 418 P.3d 501 (Colo.

2018) ('*Fisher II*'), evidence by which a reasonable person could find the insurer's benefits decisions 'fairly debatable' weighs against a conclusion that the insurer acted unreasonably." *Cooper v. Shelter Gen. Ins. Co.*, 653 F. Supp. 3d 873, 878 (D. Colo. 2023); *see also Glacier Const. Co. v. Travelers Prop. Cas. Co. of Am.*, 569 F. App'x 582, 590 (10th Cir. 2014) (recognizing that "a 'fairly debatable' showing, standing alone, is insufficient to support summary judgment for the insurer" under § 10-3-1115, but concluding that "[t]his does not, however, preclude summary judgment where 'there are no genuine issues of material fact [and] reasonableness may be decided as a matter of law'") (quoting *Schuessler v. Wolter*, 310 P.3d 151, 162 (Colo. App. 2012)); *see also Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1227 (10th Cir. 2016) (concluding that "fair debatability can be a relevant but not necessarily a determinative factor as to whether the insurer acted reasonably" under § 10-3-1115).

Under Colorado law, "acting 'without a reasonable basis' has been construed to mean pursuing a groundless position that is not supported by credible evidence." *Cooper*, 653 F. Supp. 3d at 878 (quoting *Masters v. Safeco Ins. Co. of Am.*, No. 20-cv-00631-PAB-NRN, 2021 WL 4326269, at *5 (D. Colo. Sept. 23, 2021)). "[T]he question is whether a reasonable insurer under similar circumstances would have denied or delayed payment of the claim." *Bankr. Est. of Morris v. COPIC Ins. Co.*, 192 P.3d 519, 523 (Colo. App. 2008). The reasonableness of an insurer's conduct must be determined objectively, based on proof of industry standards. *Schultz v. GEICO Cas. Co.*, 429 P.3d 844, 847 (Colo. 2018).

As to industry standards, the Colorado Unfair Claims Practices Act defines a number of "unfair claim settlement practices" that "may be evidence of insurance [industry] standards"—noncompliance with which "may be evidence of unreasonableness." *Bonbeck Parker, LLC v.*

26

*Travelers Indem. Co. of Am.*, 611 F. Supp. 3d 1115, 1129 (D. Colo. 2020) (citing *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 343-44 (Colo. 2004)); *see also* Colo. Rev. Stat. § 10-3-1113(4) ("willful conduct of the kind set forth in section 10-3-1104(1)(h)(I) to (1)(h)(XIV) is prohibited and may be considered" "[i]n determining whether an insurer's delay or denial [of payment] was reasonable"). As relevant to Mr. Horace's assertions here, ECF No. 40 at 10-16, the Act states that the following are unfair claim settlement practices, *if* the proponent can demonstrate they were done willfully:

- Misrepresenting coverage under the Policy;

- Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;

- Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;

- Attempting to settle the claim for less than indicated in its advertising material;

- Failing to promptly settle the undisputed portion of his claim; and

- Failing to promptly provide a reasonable explanation under the Policy in relation to the law—here, for Cincinnati's alleged refusal to pay sales tax on the agreed value of the Truck.

Colo Rev. Stat. §§ 10-3-1104(1)(h)(I), (VI), (VII), (VIII), (XIII), (XIV). These unfair claim settlement practices "may be used as valid, but not conclusive, evidence of industry standards[.]" *Allen*, 102 P.3d at 344.

### B.    Analysis

Here, there is no genuine factual dispute as to whether Cincinnati acted unreasonably, and so Cincinnati is entitled to judgment as a matter of law on Mr. Horace's statutory bad faith claim.

### 1.    Valuation of the Truck

The core assertion underlying Mr. Horace's claim to entitlement to summary judgment is that, following the January 3, 2024 determination that the Truck was a total loss, Cincinnati owed him—immediately, in his view—the $35,024 agreed value of the Truck. ECF No. 40 at 8-9. That allegedly undisputed amount, according to Mr. Horace, should have been transmitted to him as a "*Fisher* payment," while the parties continued to negotiate about a potentially higher actual cash value for the Truck. *See id.*; *see also Fisher*, 418 P.3d at 502 (holding that "insurers have a duty not to unreasonably delay or deny payment of covered benefits, even though other components of an insured's claim may still be reasonably in dispute"). Not so, Cincinnati says in rejoinder. Per Cincinnati, there was no undisputed amount owed under *Fisher* as of January 3, 2024, because the parties immediately launched into discussions "to determine . . . what settlement to reach"—a dialogue culminating on February 7, 2024, when Mr. Horace agreed to accept an actual cash value payment of $41,709.10, an amount obviously higher than the $35,024 agreed value of the Truck. *See* ECF No. 54 at 10-11. The undisputed summary judgment evidence shows that Cincinnati has the better argument.

The record permits of no dispute concerning the back-and-forth between the parties that commenced on January 3 and concluded on February 7, 2024. Undisputed Material Facts 11-23, 28-30, 32-33. Neither is there a dispute that Cincinnati understood the claim to have been in dispute until the parties reached an agreement that the actual cash value (and not the agreed value of thousands of dollars less) was the amount that would be paid to Mr. Horace to settle his claim. As Mr. Gearlds, Cincinnati's witness designee under Rule 30(b)(6), explained, the company did not pay the agreed value right away because "[i]t was a disputed claim. *The agreed value wasn't*

*the proper measure of damage*." Undisputed Material Fact 26 (emphasis added). The parties were engaged in claim-settlement negotiations until February 7, 2024, and, therefore, the actual cash value to be paid for the total loss of the Truck remained in dispute until Mr. Horace's assent to that amount. Mr. Horace may have preferred to have received a check for the lower agreed value a few weeks earlier than he was paid, but he points to no law, and this court has located none, dictating that an insurance policy establishing a framework like the one here— guaranteeing the insured a minimum payment for a lost vehicle but anticipating that a more fulsome evaluation (resulting in a potentially higher payment) must occur—*immediately* entitles the insured to payment of the minimum amount. Nor does the Policy itself contemplate such a posthaste payment. *See generally* ECF No. 41-1 (no mention of such a payment obligation in the Policy).

As it happened, the four weeks of negotiations between Cincinnati and Mr. Horace redounded to Mr. Horace's benefit by placing more than $6500.00 extra dollars in his pocket. Undisputed Material Fact 33. In this context, the defined, and significantly lower, agreed value might reasonably be construed as an initial settlement offer, not an acknowledgment of a definitive amount that was indisputably owed under the Policy so as to trigger a statutory bad faith claim. As judges in this District repeatedly have emphasized, offers of settlement are "not admissions or agreements that the plaintiff is owed the amount of the settlement offer. Plaintiff's attempt to turn the insurer's effort to negotiate a settlement into statutory and common law bad faith claims is unfounded and would create a dubious and dangerous precedent." *See McKinney*, 2021 WL 4472921, at *6 (quoting *Irey v. State Farm Mutual Automobile Insurance Co.*, No. 20-cv-01324-RBJ (D. Colo.) (ECF No. 39)); *see also Abrams v. State Farm Mut. Auto. Ins. Co.*, No.

20-cv-01592-DDD-NRN, 2023 WL 9688414, at *3 (D. Colo. Dec. 8, 2023) (rejecting a statutory

bad faith claim based on an insurer's failure to immediately pay its first settlement offer while

the parties continued to dispute the ultimate amount of coverage owed to the plaintiff, and

observing that "[a]t no point did State Farm definitively conclude that it owed a specific amount

for one type of damages yet withheld that amount, like in *Fisher II*"); *Cooper*, 653 F. Supp. 3d at

879-80 ("There is ample authority, both in Colorado and from this circuit, to support the

proposition that an insurer's settlement offer does not constitute a concession the insured is

indisputably owed the amount offered.") (collecting cases).

So, too, does this court reject as lacking in factual and legal support the proposition that

the agreed value amount was indisputably the covered amount, *see Fisher II*, 418 P.3d at 506,

such that Cincinnati's decision to evaluate the claim to determine whether the actual cash value

might exceed the agreed value amounted to unreasonable delay under § 10-3-1115. During that

brief evaluation process, the amount of the Policy benefits remained in dispute, and so it was not

unreasonable as a matter of law for Cinnaniti to withhold payment, whether pursuant to *Fisher* or

otherwise.[13] And it further bears emphasizing that the time Cincinnati took to make this

evaluation was undeniably small, likewise precluding a finding of a genuine dispute concerning

---

[13] Mr. Horace contends that Cincinnati "had already determined on January 10, 2024"—
definitively, he implies—that the maximum amount it could offer for the Truck was $36,467.88,
*see* ECF No. 49 at 17 n.2, but he points to no evidence in the record to support that statement.
This court's own search of the record belies Mr. Horace's contention. The email exchanges
between Cincinnati and Mr. Horace on January 10, 2024, describe an offer Cincinnati was
making "[a]t this time," *see* ECF No. 41-5 at 3, and the numerous emails post-dating January 10,
2024—coupled with the final valuation of the truck in excess of $41,000—plainly indicate that
Cincinnati did not intend to, and did not in fact, halt negotiations about the value of the Truck on
that date.

unreasonable delay on that basis.

From the date Mr. Horace reported the claim (January 2, 2024) to the date he filed suit (January 23, 2024), just twenty-two days had passed, and only thirty-six days elapsed between the claim report and Mr. Horace's acceptance of Cincinnati's settlement offer on February 7, 2024. In light of this acknowledged chronology, Mr. Horace has failed to adduce evidence sufficient to genuinely dispute that the timing of Cincinnati's valuation evaluation does *not* amount to undue delay under § 10-3-1115.

"Under Colorado law, there is no brightline rule for the length of time that constitutes per se unreasonable delay in evaluating a claim[.]" *Iwaskow v. Safeco Ins. Co. of Am.*, No. 21-cv-00005-PAB-SBP, 2023 WL 6376712, at *7 (D. Colo. Sept. 29, 2023). But the Tenth Circuit has confirmed that the timeline emerging from the record here falls squarely on the reasonable side of the line. Specifically, "where an insurance company requested more information 24 days after receiving a demand and presented a settlement offer 46 days after receiving the demand, no reasonable jury could find the insurer unreasonably delayed investigating the claim." *Id.* (citing *Williams*, 621 F. App'x at 920) (applying Colorado law).[14] In accordance with that principle, this court concludes—based on the undisputed timeline showing that Cincinnati presented the settlement offer that Mr. Horace accepted just thirty-seven days after the accident, with other settlement offers preceding that, *see* Undisputed Material Facts 13, 18, 23—no reasonable jury

---

[14] "Owners received Ms. Williams's demand package on January 13, 2012. On February 6, Owners requested further documentation. On February 29, 2012, Owners offered $75,000. Thus, 46 days elapsed between Ms. Williams's demand and Owners' offer. We conclude that under these circumstances, no reasonable jury could find that Owners unreasonably delayed investigating Ms. Williams's UIM claim." *Williams*, 621 F. App'x at 920.

could find that Cincinnati unreasonably delayed action on the valuation (and payment) of Mr. Horace's claim. *See id.*; *see also Glacier*, 569 F. App'x at 590-91 (holding that a four-month interval between the submission of a claim and the insurer's decision to deny the claim, where the insurer continued to evaluate the claim in the intervening period, failed to establish bad faith by the insurer: "Based on the undisputed facts, summary judgment was appropriate because no reasonable jury could have found that Travelers unreasonably delayed or denied processing Glacier's claim, a determination that is fatal to both the statutory and common law claims."). Here, Mr. Horace offers no authority, and this court has located none, suggesting that this timeframe is outside the industry standard, where "[u]nreasonable delay typically involves an insurance company sitting on a claim for months or even years." *KAT Constr. Mgmt. LLC v. Safeco Ins. Co. of Am.*, No. 19-cv-02981-RM-KLM, 2022 WL 136905, at *6 (D. Colo. Jan. 14, 2022) (quoting *Vinnedge v. Owners Ins. Co.*, No. 19-cv-03521-RBJ, 2021 WL 2290786, *5 (D. Colo. 2021)); *see also Stamey v. National General Ins. Co.*, No. 15-cv-00560-WJM-MJW, 2016 WL 8540310, *3-4 (D. Colo. 2016) (noting that Colorado Division of Insurance Regulation § 5-1-14 provides insurers with a 60-day "safe haven" in which to respond to claims without facing an administrative penalty for delay, and concluding that the regulation constituted evidence of the industry standard that a delay of payment of two months is not unreasonable).

The court's conclusion that no reasonable jury could find unreasonable delay under the circumstances here is not negated by Mr. Horace's reference to the aforementioned provisions of the Colorado Unfair Claims Practices Act. *See* ECF No. 40 at 10-16. To be sure, Mr. Horace advances a litany of criticisms of Cincinnati's actions over the course of the days preceding his acceptance of the actual-cash-value settlement offer on February 7, 2024, which he claims forced

him to file a lawsuit on January 24, 2024—just twenty-three days after he reported the accident to Cincinnati. *See id.* But the provisions of § 1104(h) merely provide "evidence of what is reasonable"; they are "not conclusive of the statutory standard of reasonableness under § 10-3-1115." *See Stamey*, 2016 WL 8540310, at *4 (citing *Allen*, 102 P.3d at 343-44) ("where the legislative enactment or administrative rule is not conclusive of the standard of care, the statute or rule may be used as evidence of the standard of care from which the trier of fact may evaluate the defendant's conduct"). While Mr. Horace has presented evidence of his objections, the record also contains Cincinnati's explanations—which it contemporaneously conveyed to Mr. Horace—concerning the bases for its calculations of the offers it transmitted to Mr. Horace.

Cincinnati has articulated, for example, that it does not add sales tax or fees to the agreed value when there is a total loss; how it arrived at the actual cash value using AutoSource; why it paid Mr. Horace half the agreed value on January 19, 2024, "in an act of good faith"; and why it could not provide the balance until Mr. Horace had surrendered the title. Undisputed Material Fact 24. Although Mr. Horace claims Cincinnati's analysis was faulty in multiple respects, the record before the court demonstrates that Cincinnati's position leading up to the February 7, 2024 agreement on the valuation was, at a minimum, "fairly debatable." *See Glacier*, 569 F. App'x at 589-90 (recognizing that under § 10-3-1115 "it is reasonable for an insurer to challenge claims that are 'fairly debatable'") (quotation omitted). While not determinative on its own, *see id.* at 590, the fairly-debatable finding—coupled with the parties' undisputed agreement concerning the calculation of the actual-cash-value of the Truck within thirty-five days of its being deemed a total loss—would preclude a reasonable juror from finding that Cincinnati "pursued a groundless position . . . not supported by credible evidence." *Cooper*, 653 F. Supp. 3d

at 878. And on this record showing that Cincinnati explained its position in consistent, contemporaneous email communications with Mr. Horace, *see* Undisputed Material Facts 13, 18, 23, 24, neither could a reasonable juror conclude that Cincinnati acted "in willful violation" of the standards for unfair claim settlement practices set forth in § 10-3-1104(h).

Finally, and similar to his reference to the Unfair Claim Practices Act, Mr. Horace contends that Cincinnati's actions are "objectively unreasonable" because they purportedly ran afoul of the requirements of Colorado's Total Loss Statute, Colo. Rev. Stat. § 10-4-639. *See* ECF No. 49 at 14. According to Mr. Horace, Cincinnati violated that statute—and, by definition, behaved unreasonably—because it tried to "shave off . . . Colorado's mandatory sales tax and fees" and because it did not have a "record of its methodology for determining a total loss evaluation." *Id.* at 7 ¶ 44, 20 (citing §§ 10-4-639(1), (3)). Cincinnati counters that, by referencing the Total Loss Statute, Mr. Horace "seems to be conflating two separate causes of action for bad faith and he only brought a claim under" § 10-3-1115. ECF No. 54 at 9. But the court understands Mr. Horace to be pointing to § 10-4-639 only as "evidence of [an] insurance [industry] standard[]," and Cincinnati's alleged noncompliance with that standard as "evidence of unreasonableness." *See Bonbeck*, 611 F. Supp. 3d at 1129.

On this point, Mr. Horace runs into the same hurdle as with his analogous invocation of the provisions of the Unfair Claim Practices Act. Cincinnati's purported non-compliance with § 10-4-639 is not definitive confirmation that Cincinnati behaved unreasonably and, further, Cincinnati has presented evidence—unrefuted by Mr. Horace—that its offer did include sales tax. Mr. Gearlds, Cincinnati's Rule 30(b)(6) witness, testified that sales tax is "contemplated within" the agreed value when that figure controls. *See* ECF No. 40-11 at 13:19-25; *see also id.*

34

at 26:19-22 (stating that sales tax "is incorporated into the agreed value process"). With regard to the separate question of title fees, on January 10, 2024—the very same day Mr. Horace raised the issue in connection with Cincinnati's initial settlement offer—Mr. Russell promptly countered with an offer including a $20 title-transfer fee and invited Mr. Horace to submit documentation of any additional registration fees. Undisputed Materials Fact 18.

With regard to Mr. Horace's argument concerning § 10-4-639(3), which directs that an insurer "establish a fair and consistent method for determining total loss of a motor vehicle," the evidence to which Mr. Horace points does not support his assertion that "Cincinnati has no records, documentation, or written guidelines concerning compliance with industry standards for evaluating Agreed Value claims and the payment of sales tax, title, fees or vehicle equipment." ECF No. 49 at 7 ¶ 46 (citing Gearlds's testimony stating that industry standards are determined through "a regulatory and compliance department that maintains that information, shares it with our departments, and we abide by the guidelines"). Neither does the deposition excerpt Mr. Horace references support the proposition that Cincinnati "has no documentation for a [sic] Actual Cash Value methodology[.]" *Id.* (citing Gearlds's testimony at ECF No. 49-1, 59:14-61:9, which contains no statement to that effect).

Regardless, Mr. Horace has not shown that the standards delineated in § 10-4-639 are conclusive evidence of industry standards, and the fundamental question again devolves to whether Cincinnati acted "without a reasonable basis" by "pursuing a groundless position that is not supported by credible evidence." *Cooper*, 653 F. Supp. 3d at 878. The undisputed record compels a negative answer to that query. Mr. Horace has not adduced competent evidence to create a genuine dispute of material fact that would allow a reasonable jury to conclude that

Cincinnati acted unreasonably here, where the undisputed facts show that Cincinnati promptly investigated the claim, obtained a market-based valuation, incorporated Mr. Horace's documentation regarding vehicle equipment into its analysis, issued a partial payment during negotiations, obtained Mr. Horace's agreement to the actual-cash-value amount within thirty-six days of the claim being filed, and immediately sent a check for the remaining amount upon receiving the title from Mr. Horace.[15] No reasonable jury could find that this short period—during which the insurer gathered valuation information, requested necessary title documentation, and negotiated over disputed valuation issues—constituted an unreasonable delay under the operative legal standards. *See Williams*, 621 F. App'x at 920.

Because Mr. Horace has failed to present evidence that would allow a reasonable factfinder to conclude that Cincinnati pursued a groundless position unsupported by credible evidence, and thus unreasonably delayed payment of his insurance benefit for the Truck, Cincinnati is entitled to judgment as a matter of law. Accordingly, Cincinnati's Motion is **GRANTED** on the statutory claim for unreasonable delay or denial of an insurance benefit with respect to payment for the total loss of the Truck.

---

[15] The court further rejects as unsupported by any evidence or legal authority Mr. Horace's contention that mailing him a check for the final amount of payment for the Truck, as opposed to transmitting those funds by electronic payment, *see* ECF No. 49 at 18, creates a triable issue on the question of unreasonable delay. Mr. Horace identifies no Policy provision, statutory requirement, or industry standard obligating Cincinnati to use electronic payment, nor has he submitted any evidence that Cincinnati selected the paper-check method for an improper purpose as opposed to a routine administrative practice. The passage of nine days between the time Cincinnati put the check in the mail on February 13 (it may have been February 12; the court finds the record somewhat unclear on this point) and when Mr. Horace deposited it on February 22, Undisputed Material Facts 34-36, could not be construed by a reasonable jury as an action without a reasonable basis or marked by undue delay.

### 2.    Post-Litigation Out-of-Pocket Transportation Expenses

Turning next to the component of Mr. Horace's statutory bad faith claim asserting that Cincinnati unreasonably delayed or denied payment of certain transportation expenses, Cincinnati argues that it is entitled to summary judgment because it owed Mr. Horace no duty to negotiate, settle, or pay these expenses because they accrued—and Cincinnati's alleged delay in paying them arose—*after* Mr. Horace filed this civil action. ECF No. 41 at 17-8; ECF No. 54 at 12. The court respectfully agrees.

Under Colorado law, "the initiation of an adversarial proceeding (i.e., litigation) combined with a genuine disagreement as to the amount of a claim may suspend an insurer's duty to negotiate, settle, or pay." *Pace v. Travelers Home & Marine Ins. Co.*, No. 20-cv-01507-NYW, 2020 WL 6393035, at *3 (D. Colo. Nov. 2, 2020) (citing *Rabin v. Fid. Nat. Prop. & Cas. Ins. Co.*, 863 F. Supp. 2d 1107, 1113 (D. Colo. 2012) (relying on *Bucholtz v. Safeco Ins. Co. of America*, 773 P.2d 590, 592-93 (Colo. App. 1988)). "Generally, such circumstances do not make it unreasonable for an insurer to refuse to negotiate, settle, or pay a claim." *Id.* (citing *Wahlert v. Am. Standard Ins. Co. of Wisconsin*, 173 F. Supp. 3d 1187, 1193 (D. Colo. 2016); *Jewell v. State Farm Mut. Auto. Ins. Co.*, No. 18-cv-02536-KLM, 2020 WL 1627348, at *7 (D. Colo. Feb. 26, 2020) (recognizing that an insurer's "obligation to negotiate payment was cut off pending resolution of th[e] lawsuit," where the insured submitted a demand for underinsured motorist benefits nearly a year after initiating the lawsuit)); *see also Johnston v. Standard Fire Ins. Co.*, No. 20-cv-02106-CMA-MEH, 2022 WL 1225311, at *4 (D. Colo. Apr. 25, 2022) (where lawsuit had been filed, and there was a genuine disagreement regarding damages at the time suit was filed, insurer's duty to negotiate, settle, or pay claim was suspended); *Baker v. Allied Prop. &*

*Cas. Ins. Co.*, 939 F. Supp. 2d 1091, 1109 (D. Colo. 2013) ("[W]here an adversarial proceeding is filed and a genuine disagreement as to the amount of compensable damages exists, the duty to negotiate is suspended, and there is no duty to advance payment of claims.").

As pertinent to the summary judgment question here, it is undisputed that on January 23, 2024—after Mr. Horace advised that he would be suing Cincinnati—Mr. Russell took note of Mr. Horace's "unwilling[ness] to negotiate" and informed him that Cincinnati would be "releasing the remaining half of the total loss payment" and would cease covering his rental-car expenses as of January 30, 2024. Undisputed Material Facts 28, 30. As Mr. Russell stated, "[o]ur rental payments are only owed to policy holders until you receive the total loss payment." Undisputed Material Fact 30; *see also id.* (noting that Russell gave Horace "an extra week [of rental coverage] out of courtesy as CAPSTONE policy holder"). Mr. Horace made good on his threat to sue Cincinnati on January 24, 2024. ECF No. 3 at 1. Even so, Cincinnati covered Mr. Horace's rental expenses until February 2, 2024, Undisputed Material Fact 37, and ultimately paid him for the rental costs he incurred in February and March 2024; on November 26, 2024, Cincinnati sent him a check as reimbursement for the $1900.96 in out-of-pocket rental costs for the rental of the Mercedes and Maserati SUVs. Undisputed Material Fact 40. Based on this undisputed record, the court concludes that Cincinnati's duty to negotiate, settle, or pay the $1900.96 in post-litigation rental-car expenses was suspended for purposes of Mr. Horace's statutory bad faith claim.

First, Mr. Horace initiated this civil action on January 24, 2024, *before* he incurred the February and March 2024 rental expenses. *See Rabin*, 863 F. Supp. 2d at 1113 (concluding the initiation of a bad faith lawsuit constituted an adversarial proceeding for purposes of suspending

an insurer's duty to negotiate, settle, or pay a claim).

Second, and critically, there is a genuine dispute between the parties concerning whether Cincinnati was obliged to reimburse Mr. Horace for the rental expenses he incurred in February and March 2024. As Mr. Russell conveyed to Mr. Horace, Cincinnati was of the view that once the insurer was ready to transmit to him the "total loss payment" on January 23, 2024, no further transportation expenses would be owed under the Policy. Undisputed Material Fact 30. Mr. Horace counters that "[t]here is no policy provision, law, or regulation which gives Defendant the authority to unilaterally terminate Plaintiff's temporary transportation expense benefits or defines when these benefits would terminate." ECF No. 49 at 18.[16] The existence of this dispute was sufficient to suspend Cincinnati's duty to negotiate or settle Mr. Horace's claim for the February and March 2024 rental-car expenses. *See, e.g.*, *Vaccaro*, 275 P.3d at 759 ("An insurer is under no obligation to negotiate a settlement when there is a genuine disagreement as to the amount of compensable damages payable under the terms of an insurance policy.") (citing *Bucholtz*, 773 P.2d at 593); *Baker*, 939 F. Supp. 2d at 1108-09 (initiation of a bad faith lawsuit can demonstrate a genuine disagreement as to the amount of a claim under Colorado insurance regulations); *cf. Geoffroy v. Amica Mut. Ins. Co.*, No. 16-cv-01736-MSK-KMT, 2017 WL 11546039, at *4 (D. Colo. July 20, 2017) (concluding that it would be futile to allow insureds to

---

[16] Mr. Horace somewhat overstates this point in that the Policy does limit such expenses to the timeframe "*reasonably* required to repair or replace" the Truck. Undisputed Material Fact 6 (emphasis added). In addition, for clarity and to the extent Mr. Horace claims entitlement to the entire $15,000 in transportation expenses allowed under the Policy, *see* ECF No. 3 ¶ 57 (claiming to seek "two times the covered benefit of $15,000.00 for Transportation Expenses"), that is plainly at odds with the unequivocal language in the Policy, which provides "*a maximum of* $15,000" for "temporary transportation expenses *incurred by 'you'* in the event of a loss . . ." Undisputed Material Fact 5 (emphasis added).

amend their complaint to include a request for exemplary damages based entirely on the insurer's post-litigation conduct because the initiation of the bad faith lawsuit, which demonstrated a genuine disagreement as to the amount of the claim, suspended the insurer's duty to negotiate, settle, or pay).

Accordingly, Cincinnati is entitled to judgment as a matter of law on Mr. Horace's statutory bad faith claim related to the reimbursement for the $1900.96 in rental-car expenses he incurred in February and March 2024.

*          *          *

In sum, even crediting Mr. Horace's evidence as the non-movant and drawing all justifiable inferences in his favor, he has failed to adduce sufficient evidence to establish a triable issue on either component of his statutory bad faith claim. Summary judgment therefore is **GRANTED** in favor of Cincinnati on the statutory bad faith claim in its entirety.

IV.     **Cincinnati Is Entitled to Summary Judgment on the Declaratory Judgment Claim**

Finally, Mr. Horace purports to assert a "claim" for "declaratory judgment." ECF No. 3 ¶¶ 58-61 (fourth claim for relief). Cincinnati moves for summary judgment on this asserted claim, ECF No. 41 at 18-19, in which Mr. Horace asks the court to declare his rights under the Policy. Specifically, he demands "a declaration that the Insurance Contract provided Plaintiff the Agreed Value of $35,024.00 in addition to a payment pursuant to C.R.S. § 10-4-639 for related title, tax, and registration fees, and Transportation Expenses up to $15,000.00, in addition to a payment for damages or lost equipment and property as a result of the motor vehicle collision and total loss, in addition to other applicable covered benefits not disputed, in example, medical

40

payments coverage." *Id.* ¶ 61. This is not a viable claim, and summary judgment must be granted to Cincinnati.

"Because declaratory judgment acts are procedural rules, 'federal law determines whether a district court may properly enter a declaratory judgment' in a diversity case." *TBL Collectibles, Inc. v. Owners Ins. Co.*, 285 F. Supp. 3d 1170, 1194 (D. Colo. 2018) (quoting *Addison Ins. Co. v. Maynard*, 08-cv–00054-WDM–BNB, 2008 WL 2079143, at *2 (D. Colo. 2008)). And the Tenth Circuit has recently reemphasized the long-held precept that the federal "Declaratory Judgment Act is not an independent cause of action." *VanHorn v. Salvation Army*, No. 24-3126, 2026 WL 1257804, at *6 (10th Cir. 2026) (unpublished). Rather, it is a remedy. *See, e.g.*, *Utah Hous. Corp. v. Country Pines, Ltd.*, 541 F. Supp. 3d 1288, 1296 n.1 (D. Utah 2021)). There being no legitimate "claim" for declaratory judgment, Cincinnati is entitled to summary judgment on Mr. Horace's purported fourth claim on this basis alone. *See Savant Homes, Inc. v. Collins*, No. 13-cv-02049-WJM-MEH, 2015 WL 899302, at *11 (D. Colo. Feb. 27, 2015) ("As a declaratory judgment is a form of relief rather than an independent cause of action, the Court finds that summary judgment on any such 'claim' in the Complaint is appropriate.") (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937) (holding that the Declaratory Judgment Act does not create an independent cause of action but only affords a form of relief previously unavailable)), *aff'd*, 809 F.3d 1133 (10th Cir. 2016).

Regardless, even if the court were to set aside questions concerning the legal rectitude of treating a request for declaratory relief as a freestanding cause of action, Cincinnati still would be entitled to summary judgment on such a claim. The only commonsense reading of the declaration Mr. Horace seeks—emphasizing the responsibilities of Cincinnati under the Policy,

*see* ECF No. 3 ¶ 61—exposes its purpose as entirely duplicative of that underlying his breach of contract and statutory unreasonable delay claims. Because this court has determined that there is no question of material fact regarding Cincinnati's performance under the contract, and because Mr. Horace has failed to adduce evidence sufficient to create a triable issue on the question of unreasonable delay, his mirror-image declaratory judgment claim likewise must be resolved in favor of Cincinnati. *See Easton v. Encompass Indem. Co.*, No. 18-cv-02563-STV, 2021 WL 7542563, at \*5 (D. Colo. Aug. 31, 2021) (granting summary judgment in favor of insurer on a duplicative claim for declaratory judgment where the court "determined that there is no question of material fact regarding whether Defendant has performed under the contract"); *see also, e.g.*, *Tom's Urban Master LLC v. Fed. Ins. Co.*, No. 20-cv-03407-PAB-SKC, 2022 WL 974654, at \*7 (D. Colo. Mar. 31, 2022) (dismissing breach of contract claims and corresponding claims for declaratory judgment); *TBL Collectibles*, 285 F. Supp. 3d at 1197 (granting summary judgment for defendant on declaratory judgment claim where that claim was not independent of the breach of contract claim); *PDX Pro Co., Inc. v. Dish Network, LLC*, No. 12-cv-01699-RBJ, 2013 WL 3296539, at \*2 (D. Colo. July 1, 2013) (dismissing declaratory judgment claim because it would be resolved in deciding plaintiff's allegations of breach of contract and breach of duty of good faith and fair dealing); *Café Plaza de Mesilla Inc. v. Cont'l Cas. Co.*, 519 F. Supp. 3d 1006, 1016 (D.N.M. 2021) (dismissing declaratory judgment claims as duplicative of breach of contract claims because "ruling against Plaintiff on its breach of contract claims necessarily resolved all issues identified in Plaintiff's declaratory judgment claims") (citation modified).

Consistent with the analysis in this well-reasoned, pertinent authority, summary judgment is **GRANTED** in favor of Cincinnati on Mr. Horace's declaratory judgment claim.

**CONCLUSION**

For the reasons set forth herein, **IT IS RESPECTFULLY**

**ORDERED** that Defendant Cincinnati Insurance Company's Motion for Summary Judgment, ECF No. 41, is **GRANTED** as to all claims. It is further

**ORDERED** that Plaintiff's second claim for relief (for alleged deceptive practices under Colo. Rev. Stat. § 10-3-1104(1), third claim for relief (for statutory bad faith under Colo. Rev. Stat. §§ 10-3-1115 and 10-3-1116), and fourth claim for relief (for declaratory judgment) are **DISMISSED with prejudice**. It is further

**ORDERED** that Plaintiff's first claim for relief (for breach of contract) is **DISMISSED without prejudice as moot**. It is further

**ORDERED** that Plaintiff Ryan Horace's Motion for Summary Judgment (ECF No. 40) is **DENIED**. It is further

**ORDERED** that, in light of the disposition of this matter, Plaintiff's Motion to Exclude and Strike the Report and Anticipated Testimony of Defendant's Retained Expert David Werber (ECF No. 39) is **DENIED as moot**. It is further

**ORDERED** that the Clerk of Court shall enter judgment in favor of Defendant Cincinnati Insurance Company and shall terminate this action. It is further

**ORDERED** that Defendant Cincinnati Insurance Company is awarded costs and shall, within **14 days of the date of this Order**, file a bill of costs in accordance with the procedures set forth in Federal Rule of Civil Procedure 54(d)(1) and D.C.COLO.LCivR 54.1, which shall be taxed by the Clerk of Court.

DATED: June 1, 2026                    BY THE COURT:

_____

Susan Prose
United States Magistrate Judge